UNITED STATES of America, Plaintiff–Appellee,

v.

Walter L. HUGHES, Defendant–Appellant.

No. 92–3533.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1993.

Decided May 24, 1993.

Bradley W. Murphy, Asst. U.S. Atty., Gerard A. Brost (argued), Peoria, IL, for plaintiff-appellee.

William K. Holman (argued), Timothy J. Cusack, Cusack & Fleming, Peoria, IL, for defendant-appellant.

Before COFFEY, MANION, and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Following his conviction, defendant Walter L. Hughes appeals from the denial of his pretrial motion to suppress evidence.

## Background

In 1991, defendant was arrested in Illinois and charged with Count I, possession of an unregistered firearm, 26 U.S.C. §§ 5861(d), 5871, and Count II, possession of a firearm by a convicted felon, 18 U.S.C. § 922(g). In 1992, defendant filed his motion to suppress physical evidence, which the district court denied. Subsequently, defendant pled guilty to Count II, and the government agreed to dismiss Count I. Defendant reserved the right to appeal the adverse ruling on his motion to suppress. Defendant was sentenced to a 27 month term of imprisonment.

A transcript reveals that on November 19, 1991, at about 2:30 a.m., the Peoria Police Department received a "911" telephone call from a woman identifying herself as Rosie Moore. She asked that police be sent to 906 Madison, a house across the street from the telephone booth from which she was calling. She said it was a "dope house," and said that "they got my daughter up in there," and that her daughter was 13 years old. She was concerned about waiting to enter the house until the police arrived. "[I]f I wait on an officer to go up in there they gonna be in, and dumped all the dope."

Officer Richard Ledbetter testified that he received the radio dispatch message which stated: "Supposed to be a 13–year–old girl inside a crack house. Her mother is going to meet you there, but the mother said she was going to go ahead and go into the apartment and we advised her to wait for the officers to arrive." Thirty seconds after receiving the call Ledbetter arrived at the house. For the previous four months, Ledbetter had been told by various people leaving the house that "they were there to buy crack cocaine." Ledbetter had thus formed the opinion that the house was a "crack house."

Officer Ledbetter, Officer Kenneth Tegard, and Officer Larry Schick approached the house. There was no sign of the 911 caller. The building had two front doors. One led to the downstairs of the home, and the other led upstairs. As the officers approached, a woman (later identified as Rosemary Gibson a/k/a Rosie Moore) and a young man (later identified as Darryl Robinson) were exiting the downstairs door. The woman turned back through the open front door, shouted "police" or "cops," and she and the boy fled into the house, leaving the door open.

The officers entered the home, and saw Gibson and Robinson split up. Tegard chased Gibson; Ledbetter chased Robinson. Robinson ran to a couch and shoved his hand down the back of it. Ledbetter drew his weapon and ordered Robinson to move his

hand slowly away from the couch. Ledbetter saw marijuana, capsules and tablets on the table.

Tegard saw Gibson run into a room where defendant was lying on a couch. Defendant told Tegard that he rented that room in the apartment. Tegard, to secure his own safety, had defendant stand up. He patted him down for weapons, then checked the couch and found a sawed-off .22 rifle under the cushions. Defendant had bullets for the rifle in his pockets.

Tegard and Ledbetter then searched the downstairs of the house for the 13–year–old girl. They did not search the upstairs apartment. She was not found. It was later discovered that Rosie Moore was the woman who ran back into the apartment upon seeing the police arrive at the scene.

Ledbetter testified that he was concerned for the safety of the 13–year–old girl. He did not know if she was being held against her will, or if she was there using drugs. He entered the downstairs of the house because the dispatcher's call and the couple's conduct led him to believe other persons were inside the house. Tegard testified that his concern was for the safety of both the mother and the child, and that from past experience he knew that drug houses often had several guns available for protection.

The district court denied the motion to suppress. It found that the police had a reasonable basis to believe an emergency existed and that the mother and child might be in danger. Once inside, they were allowed to make a protective search of the couch where defendant was lying.

**Discussion**

■ We will not overturn the district court's decision on the motion to suppress unless it was clearly erroneous. *United States v. Bennett*, 908 F.2d 189, 192 (7th Cir.1990). Warrantless searches are per se unreasonable under the Fourth Amendment subject to a few well-delineated exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978). The exigent circumstances exception to the warrant requirement provides that a "warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978). The Fourth Amendment does not "bar police officers from making warrantless entries and searches when they reasonably believe a person within is in need of immediate aid." *Mincey*, 437 U.S. at 392, 98 S.Ct. at 2413.

■ In the present case, we find that exigent circumstances existed. Defendant does not challenge the search of the downstairs; he focuses his challenge on the initial entry into the home. The police, however, had information that indicated a woman and child might be inside the house and in danger. The police believed, based on past interviews with numerous people, that it was a "drug house." They knew that guns were often kept in drug houses. As they approached the house at 2:30 that morning, they saw a woman and boy run back into the house, yell "police," and leave the door open.

At this point, the Fourth Amendment would not require the police to obtain a warrant to enter the front door, when the child and mother may have been in jeopardy, and the arrival of the police had been announced to the home's occupants.

■ After they were already within the front door, requiring the police to seek a warrant would add little or no protection to defendant's privacy interests in this unique factual scenario. *See United States v. Salava*, 978 F.2d 320, 325 (7th Cir.1992). As they stepped into the house, one officer saw defendant lying on a couch, and they saw and heard much chaos among other people in the apartment as Gibson and Robinson ran through the two rooms. It was reasonable to pat down defendant and the area where he was lying in order to protect their own safety as they inquired about the presence of the 13–year–old girl and her mother. *See United States v. Ware*, 914 F.2d 997 (7th Cir. 1990) (exigent circumstances for search or seizure without warrant where the safety of the officers or third persons is threatened).

We hold that the circumstances justified both a warrantless entry and the subsequent search of the area immediately around the

defendant to prevent unreasonable risk to themselves.

Accordingly, the judgment of the district court is AFFIRMED.