**S.D.J., a Child, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11–93–317–CV.**

Court of Appeals of Texas,
Eastland.

June 23, 1994.

Rehearing Denied July 21, 1994.

James J. Elliott, Stephenville, for appellant.

John Terrill, Dist. Atty., Stephenville, for appellee.

## Opinion

DICKENSON, Justice.

The jury found that S.D.J., a child, engaged in delinquent conduct by intentionally causing the death of his stepmother. After hearing additional testimony, the jury found that the child was in need of rehabilitation or the protection of the public required that a disposition be made; that the child used a deadly weapon during his commission of the delinquent conduct; and that the child should be sentenced to the Texas Youth Commission for 40 years. The child appeals. We affirm.

### Points of Error

Appellant argues in three points of error that the trial court erred: (1) by denying the motion suggesting that the child is mentally ill (and requesting hospitalization for observation and treatment); (2) by refusing the requested charge on the lesser included offense of voluntary manslaughter; and (3) by allowing testimony as to "inadmissible oral statements" made by the child while he was in custody.

1. The father denied that he ever asked his son to kill his stepmother. The child claimed that he killed her because his father threatened to have him killed if he did not kill her. The father admitted that he had two felony convictions for aggravated sexual assault and one other felony

### Background Facts

The child testified during the adjudication phase of these juvenile court proceedings (he was 14 years old at the time of the delinquent conduct). He admitted that he shot his stepmother three times with a single-shot .410 shotgun on Thursday afternoon, May 6, 1993, at their home in Erath County. He said that they got out of school early that day, that his father picked him up at school and took him home, and that his father said: "Today's the day to kill your stepmother."[1]

Relevant portions of the child's testimony read as shown:

Q: Now, had your father talked to you before about killing your stepmother?

A: Yes, sir. About two months before that, two or three months before that.

Q: What did he say to you at that time?

A: He said that he was tired of my stepmother because he couldn't do what he wanted to without getting griped at, and he had said that he—he was going to divorce her, but he didn't want to go through another divorce because he'd divorced my mom and she'd got everything, or he said she had.

\* \* \* \* \* \*

And then that Thursday, he come to school and he said, "Today's the day." And I go, "For what?" And he told me it was the day to kill my stepmother. And he said, "If you don't do it, then somebody's going to shoot you."

Q: Who was going to shoot you?

A: I don't know.

Q: Pardon?

A: I don't know. He said he had a kill team or something.

\* \* \* \* \* \*

Q: Now, when you walked off [from your aunt's house], what all did you have with you?

A: I had the stuff that I had stolen out of the house.

Q: Three guns?

conviction for retaliation against a witness. Even if the child told the truth about his claim that he killed his stepmother because of his father's threats, this would not be a defense to the child's delinquent conduct in killing her.

**372**

A: Three guns, a case of beer, and a bottle of whiskey.

Q: And you had that all in the pillow case or part of it in a pillow case?

A: Yes, sir.

Q: And where did you go?

A: I went—There's a field between my aunt's house and my house, and I went out there and I put the stuff down, and I was shooting. And, I guess, I stayed out there an hour drinking. And I drank the whole case of beer, and I drank some of the whiskey.... I had to cross a barbed wire fence. I crossed it; walked across a little field in front of our house; crossed another barbed wire fence; walked in the door; she was on the phone, so I went to my room.... So I went and opened my door and walked down the hall with the gun, and ... she got up and turned around, and I shot her, then reloaded, shot again, reloaded, shot again, because I was scared, if I didn't do it, my dad told me three to five times in the head—"If you don't do it three to five times, then you're going to die anyway."

Appellant said that he went riding with two of his friends, Josh Stenseth and Amadeo Gonzales, and that he told them that he had shot his stepmother because his dad had told him that "if I didn't shoot my stepmom that I was going to die." Appellant also said that he told his friend, Gina Rush, that his dad told him to kill his stepmom and "I'd done it, because if I didn't then somebody was going to kill me."

Stenseth and Gonzales testified that appellant told them about shooting his stepmother, but neither of them implicated appellant's father. Rush did not testify. Appellant admitted that he did not tell the psychiatrist or the psychologist anything about his father asking him to shoot his stepmother.

*Denial of Motion for Hospitalization*

Appellant's court-appointed lawyer filed a motion under TEX.FAM. CODE ANN.

§ 55.01 (Vernon 1986). This section reads in pertinent part as shown:

(a) At any stage of the proceedings under this title, the juvenile court may cause the child to be examined by a physician, psychiatrist, or psychologist.

On May 12, 1993, the juvenile court judge signed orders appointing Thomas M. Murphy, M.D., and Marsha Gabriel, Ph.D., to examine appellant for the purposes of determining:

(1) whether the respondent is fit to proceed in the above entitled and numbered cause; and

(2) whether the respondent lacks substantial capacity either to appreciate the wrongfulness of the alleged conduct or to conform his conduct to the requirements of law.

The trial court also ordered each of them to file a separate report on their findings as to:

Whether the respondent is mentally ill and requires observation and/or treatment or hospitalization in a mental hospital for the respondent's own welfare and protection or for the protection of others.

The psychiatrist, Dr. Murphy, and the psychologist, Dr. Gabriel, made their respective examinations and filed reports with the court. Both of them testified at the "fitness to proceed" hearing,[2] which was held on July 12, 1993, and expressed their opinions that appellant was fit to proceed; that he did not lack the capacity to appreciate the wrongfulness of his conduct; and that he did not lack the capacity to conform his conduct to the requirements of law.[3] Neither of them found any mental illness which would require hospitalization for observation and treatment.

■ Prior to the hearing on July 12, appellant filed a motion under TEX.FAM. CODE ANN. § 55.02 (Vernon 1986 & Supp. 1994), seeking: (1) temporary hospitalization for observation and treatment and (2) a stay of proceedings in juvenile court. Section 55.02 provides in relevant part:

---

**2.** See TEX.FAM. CODE ANN. § 55.04 (Vernon 1986).

**3.** The jury answered "no" to special issues asking if they found from a preponderance of the

evidence that S.D.J.: (1) lacks the capacity to understand the proceedings or (2) is unable to assist in his own defense.

(a) *If it appears to the juvenile court*, on suggestion of a party or on the court's own notice, *that a child* alleged by petition or found to have engaged in delinquent conduct or conduct indicating a need for supervision *may be mentally ill, the court shall initiate proceedings to order temporary hospitalization of the child for observation and treatment.*

\*    \*    \*    \*    \*    \*

(d) If the juvenile court orders temporary hospitalization of a child, the proceedings under this title then pending in juvenile court shall be stayed. (Emphasis added)

Appellant argues that the juvenile court judge erred by not conducting a separate hearing under Section 55.02 before the hearing which was held under Section 55.04. We disagree. The psychiatrist and psychologist had examined appellant and had not found any mental illness which indicated a need for temporary hospitalization for observation and treatment. Section 55.02 does not mandate a hearing unless the record shows that it appeared, or should have appeared, to the juvenile court judge that the child may be mentally ill and that the mental illness indicates a need for temporary hospitalization for observation and treatment.

■ Appellant relies upon language in *T.P.S. v. State*, 590 S.W.2d 946, 949 (Tex.Civ. App.—Dallas 1979, writ ref'd n.r.e.), which states:

A finding of unfitness [under Section 55.04], however, is not the only situation in which the court is required to initiate proceedings for temporary hospitalization under section 55.02. Nothing in section 55.02, or elsewhere in the Code, limits its application to this situation. *The only prerequisite for such proceedings in section 55.02 is that it "appears to the juvenile court ... that a child alleged by petition or found to have engaged in delinquent conduct ... may be mentally ill."*

\*    \*    \*    \*    \*    \*

[T]he legislative intent is clear to require proceedings to determine the need for temporary hospitalization *whenever it appears to the juvenile court that the child may be mentally ill, even though the child is competent to understand the consequences of his acts and to aid in his defense.* (Emphasis added)

We have no disagreement with *T.P.S.* In that case, there was testimony and also medical reports indicating that the child needed inpatient psychiatric care. In the case before us, there is no such testimony. The mandatory duty to initiate involuntary commitment proceedings does not arise unless and until "it appears to the juvenile court" that the child may be mentally ill. In the case before us, neither the court-appointed psychiatrist nor the court-appointed psychologist found any mental illness requiring hospitalization for observation and treatment. The first point of error is overruled.

### *Lesser Included Offense*

■ Appellant argues in his second point of error that the trial court erred in refusing to charge the jury on the lesser included offense of voluntary manslaughter. Appellant argues that evidence from two of the State's witnesses was sufficient to raise this lesser included offense. Appellant's brief refers to the following testimony. First, Deputy Sheriff Kevin Fincher testified:

Q: So what was the final story when you left there that day?

A: That he [appellant] got mad and killed his stepmother and drug her body into the house, and then left.

The other witness, Chief Juvenile Probation Officer Dale Warren, testified:

Q: Would you tell us, as best as you can recall, and if you need to—refer to your notes, what [S.D.J.] told you happened?

A: All right. . . . He told Debbie he wanted to go someplace, wanted to leave; he responded that Debbie had said that he couldn't go out. *He said he got real angry and walked out of the house.*

\*    \*    \*    \*    \*    \*

Q: Did you ask him why he did it?

A: He—Yes, I did. He said that he was mad because she wouldn't let him go

any place and he'd had a bad week in school.

This evidence is not sufficient to require the submission of a charge on the lesser included offense of voluntary manslaughter. The first degree felony offense of murder is reduced to the second degree felony offense of voluntary manslaughter if, but only if, the guilty party "caused the death under the immediate influence of sudden passion *arising from an adequate cause.*"[4] (Emphasis added) It requires no citation of authority to state that the evidence quoted above does not constitute adequate cause under the statutory definition:

> "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

The second point of error is overruled.

### Oral In–Custody Statements

Appellant argues in his final point of error that the trial court erred by allowing testimony "as to inadmissible oral statements made by appellant while in custody." The trial court sustained appellant's motion in limine as to those statements, and a hearing was held outside the presence of the jury. In that hearing, it was shown that appellant had received all of the required juvenile warnings from the chief juvenile probation officer and that appellant voluntarily talked with the investigating officers up until the time that he was taken before the justice of the peace. At that stage of the proceedings, appellant asked to have an attorney appointed. The juvenile court's ruling after the hearing on appellant's motion in limine is shown in full:

THE COURT: All right. The oral statement given at the Police Department here in Stephenville in Erath County, tak-

en at the juvenile detention—juvenile intake center here in Erath County, is admissible. The oral statement will be admissible.

Now, the point at which the juvenile was taken to the Justice of the Peace Office to have his rights read, I want no allusion or reference to him being taken there to have his rights read to him by Judge Miller, and I want no testimony, references or inferences that he invoked his right to counsel after that point. And then no testimony concerning any statements that the Respondent made after the point that he invoked his right to counsel.

During the State's case-in-chief, the only evidence about appellant's in-custody oral statements which the jury actually heard was the oral confession permitted by the trial court's ruling.[5] There are references in appellant's brief to other in-custody oral statements, but those were outside the presence of the jury.[6]

■■■ The oral confession which the juvenile court permitted the jury to hear referred to evidence which was found in the field between the home where appellant lived and the home where appellant's aunt lived; that evidence corroborated the confession. TEX. FAM. CODE ANN. § 51.09(b)(2) (Vernon Supp.1994) provides that the statement of a child is admissible in evidence if:

> [I]t be made orally and the child makes a statement of facts or circumstances that are found to be true, which conduct tends to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed.

See and compare *Gunter v. State*, 858 S.W.2d 430, 447 (Tex.Cr.App.1993), and *Port v. State*, 791 S.W.2d 103, 107 (Tex.Cr.App.1990), which interpret TEX.CODE CRIM.PRO.ANN. art. 38.22, § 3(c) (Vernon Supp.1994), the analogous provision concerning oral confessions by

---

4. See TEX. PENAL CODE ANN. § 19.04 (Vernon 1989).

5. We note that Deputy Sheriff Fincher referred twice to "a subsequent interview" with appellant. On the first occasion, the trial court promptly sustained an objection and instructed the jury "not to consider any reference to the subsequent interview." There was no motion for mistrial. On the second occasion, there was no objection.

6. The record also shows that, after appellant testified, he was impeached by proof of what he had said to the deputy sheriff during a subsequent interview. The deputy had gone to see appellant at the request of appellant's attorney, and appellant's attorney was present during that interview.

adults. *Port* holds that, if one assertion in the oral statement is found to be true, the entire confession is admissible. *Gunter* holds that subsequent corroboration of facts which were previously unknown will make the confession admissible. The law enforcement officers did not know of the burglary nor of the stolen alcoholic beverages until appellant told them, and that statement was corroborated by finding the secreted items in the field where appellant had been drinking before he shot his stepmother.

Appellant admitted in his oral confession that he shot his stepmother with a .410 shotgun which he had stolen from his aunt's house shortly before the shooting. The oral confession also referred to the fact that he had been drinking alcoholic beverages which he had stolen at the same time and that he was under the influence of the alcoholic beverages at the time of the shooting. The oral confession also told where he had hidden some of the stolen items, including some of the alcoholic beverages and the leather scabbard for the .410 shotgun. Based upon that confession, the law officers went to the field where the articles had been secreted by appellant. Based upon appellant's oral statements, the law officers found the articles which appellant had left in the field. This is sufficient to make the oral confession admissible. The third point of error is overruled.

The judgment of the trial court is affirmed.