**William David TRAVIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–94–301 CR.**

Court of Appeals of Texas,
Beaumont.

May 8, 1996.

Rehearing Overruled May 31, 1996.

Bruce A. Hoffer, Beaumont, for appellant.

Tom Maness, Criminal District Attorney, Beaumont, Rodney D. Conerly, Asst. Criminal District Attorney, Beaumont, for state.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from a conviction for the felony offense of Capital Murder. Appellant was indicted for murdering his parents with both murders occurring during the same criminal transaction. *See* TEX.PENAL CODE ANN. § 19.03(a)(7)(A) (Vernon 1994). As appellant was a juvenile at the time the offense was committed, the jury's "guilty" verdict resulted in the trial court automatically assessing appellant's punishment at life in the Institutional Division of the Texas Department of Criminal Justice. *See* TEX.PENAL CODE ANN. § 8.07(c) (Vernon Supp.1996). Appellant raises ten points of error for our consideration.

Points of error one and two read as follows:

Point of Error No. One: Reversible error occurred when the trial court failed to charge the jury on voluntary manslaughter.

Point of Error No. Two: Insufficient evidence exists to sustain a conviction of Capital Murder since the State failed to disprove the existence of sudden passion.

■ Prior to examining appellant's first two points of error, we feel we must address the State's very interesting and compelling argument that, because appellant took the witness stand during the guilt/innocence phase of the trial and admitted having intentionally stabbed both his mother and father to death, any error having occurred during said phase was waived under the "DeGarmo Doctrine." At the time the State filed its brief with us it did not have the benefit of our opinion in *McWhorter v. State,* 911 S.W.2d 538 (Tex.App.—Beaumont 1995, no pet.). In *McWhorter,* we held that, based upon the pronouncements in *McGlothlin v. State,* 896 S.W.2d 183 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 219, 133 L.Ed.2d 150 (1995), and *DeGarmo v. State,* 691 S.W.2d 657 (Tex.Crim.App.), *cert. denied,* 474 U.S. 973, 106 S.Ct. 337, 88 L.Ed.2d 322 (1985), a defendant's admission on the witness stand, during the guilt/innocence phase of a trial, that he possessed cocaine resulted in the waiver of any error that occurred during that phase of the trial. The only issue raised by the appellant in *McWhorter* concerned whether or not a police officer conducted a legal search of the appellant's person following a routine traffic stop based upon the officer's testimony that appellant had consented to the search.

A distinction must be recognized, we feel, between the legal circumstances under which the appellant in the instant case took the witness stand and testified to the events surrounding the murders, and the legal circumstances under which the defendant in *McWhorter* testified. In *McWhorter,* the defendant was not attempting to elicit proof of a lessened criminal culpability on his part. He was attempting to show that, although he had actual care, custody, control, and management of the contraband, the police discovered said contraband by violating both the United States and Texas Constitutions as well as Texas statutory law. In the instant case, appellant's direct examination testimony, indeed much of appellant's defense, centered on showing that appellant, at most, was guilty of the lesser offense of voluntary manslaughter. Because of the strength of the evidence against him, appellant was placed in the position of having to admit to the killings in an attempt to secure a jury instruction on a lesser standard of criminal culpability to which he may have been entitled. We simply do not see this type of testimony as "judicially admit[ting] to having committed the offense for which he is on trial." *McWhorter,* 911 S.W.2d at 540. We therefore move on to address appellant's points of error.

■ We will combine our discussion of appellant's first two points of error even though point of error two reads as if it is an insufficient evidence complaint. In actuality, appellant's argument under point of error two appears to be a continuation of his argument under point of error one; being that an instruction on the lesser included offense of voluntary manslaughter should have been provided to the jury. In general, a charge on voluntary manslaughter is appropriate when there is evidence that the defendant caused the death under the "immediate influence of sudden passion arising from an adequate cause." TEX.PENAL CODE ANN.

§ 19.02(d) (Vernon 1994). The "sudden passion" must be "directly caused by and aris[e] out of provocation by the individual killed or another acting with the person killed. . . ." TEX.PENAL CODE ANN. § 19.02(a)(2) (Vernon 1994); *Adanandus v. State*, 866 S.W.2d 210, 231 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994).

We begin with a clarification of a proposition of law espoused by appellant as authority for his contention that he was entitled to a voluntary manslaughter instruction. We quote from appellant's brief:

> Appellant's counsel requested a charge on voluntary manslaughter and the Court denied that request. (record references omitted) The test is whether or not, from any source, the issue is raised. . . . Appellant contends that he raised the issue by and through his own testimony.

■ The above proposition of law is correct as far as it goes. A complete pronouncement of the test was reiterated by the Court of Criminal Appeals in *Bignall v. State*, 887 S.W.2d 21, 23 (Tex.Crim.App. 1994), a case in which the defendant was tried for aggravated robbery and denied a request for a lesser included charge of theft. In analyzing whether the Court of Appeals erred in holding that the defendant was not entitled to the theft instruction, Judge Miller, writing for the majority, stated:

> In *Rousseau v. State*, this Court recently refined the *Royster* [*v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App.1981) ] test that is to be used when determining whether a defendant is entitled to an instruction on a lesser included offense. 855 S.W.2d 666 (Tex.Crim.App.1993). Before an instruction on a lesser included offense is warranted, the following two prongs of the *Royster* test, as restated in *Rousseau*, must be satisfied: 1) the lesser included offense must be included within the proof necessary to establish the offense charged, and 2) *some evidence* must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Id.* at 673. In making this determination, this Court should review all of the evidence

presented at trial. *Id.; Bell v. State*, 693 S.W.2d 434, 442 (Tex.Crim.App.1985); *Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim.App.1984) (expressly disapproving of the consideration of solely the defendant's testimony); *Eldred v. State*, 578 S.W.2d 721, 723 (Tex.Crim.App. [Panel Op.] 1979). *Id.*

■ Although appellant's brief seems to indicate the law is unsettled, voluntary manslaughter is indeed a lesser included offense of capital murder. *Nobles v. State*, 843 S.W.2d 503, 511 (Tex.Crim.App.1992). Under the *Royster/Rousseau* test, the first prong is met. With regard to the second prong, we have examined the entirety of the trial testimony. Appellant relies on a portion of his testimony which he claims satisfies the second prong. We reproduce said portion from the statement of facts as follows:

Q. [Trial Counsel] Okay. You're in the kitchen with your dad; what happened?

A. [appellant] He looked at Todd and he looked surprised that he was there. And he looked at me and he goes, "What is he doing here?" I told him—

Q. What did you say?

A. I told him, "He's spending the night." And he sent Todd out of the room and he went back to my room.

Q. Who went back to your room?

A. Todd did.

Q. Where were you?

A. I was in the kitchen with my dad.

Q. What happened?

A. He started to yell at me and cursing me again.

Q. Why?

A. Because I hadn't asked him, himself, for permission could Todd spend the night.

Q. What did he say to you?

A. At first he said, "Who told you he could spend the night?" I told them [sic], "Mom did." And he said, "Shit Bill, don't you know if you want anything done you ask me and not your mom?"

Q. Did you say anything back to him?

A. I told him, "It's no big deal. It's not like he's never spent the night before."

Q. Did he say anything else?

A. He seemed to ignore that and he got right in my face telling me that, reminding me how stupid I am.

Q. What did he say? Do you remember what he said? Do you remember any of it?

A. · He had told me that I had been fucking up a lot lately and I don't do what I'm told. "I tell you to do this, you fuck it up. I tell you not to do this, you still fuck it up and you need to get your head out of your ass and get your shit together before you make—before you really make a mistake that will really get me on you."

Q. What did you feel like when he said that?

A. I was getting mad and tired of him yelling at me like that.

Q. What did he look like when he was saying this to you?

A. His forehead is all wrinkled and his eyebrows are down low and his face was turning red.

Q. Where was he?

A. In the kitchen with me.

Q. In relation to how close or how far away from you, where was he?

A. About right here. (Indicating)

Q. What was your feeling, your response to what he was saying to you?

[State's objection sustained]

Q. What was going through your mind? Tell the jury what you thought? [sic]

A. I thought, "I've had it. I'm tired of him yelling at me, cursing me out and making me feel inferior and I don't deserve this and I don't deserve to be treated like this, I don't have to be treated like this". [sic]

Q. · What was his tone like when he was doing this?

A. Very angry tone.

Q. Were you thinking about anything in particular when this was going on?

[State's objections sustained]

Q. Is there anything you left out?

A. I started remembering all of the other times he yelled at me recently and cursing me out and it just all built up.

Q. What were you—What were you wanting to do then?

A. Just to run out of the room and get Todd.

Q. Why?

A. Because if you want to go through with this I would have had to have been mad to do it.

Q. Well, were you mad or not?

A. I was very mad.

Q. How mad?

A. I was mad enough to go through with the plan.

Q. At that time, were you mad enough to kill your father?

A. Yes.

Q. Up until then, had you ever been mad enough to kill your father?

A. No.

Q. Up until then had you ever had any desire to kill your father?

A. No.

Q. Why then?

A. I don't know.

Q. You don't know?

A. (Whereupon, the witness shook his head as in the negative.) No.

Q. But at that point you were?

A. Yes.

Although the appellant's record reference ends his supporting testimony approximately at this point, we feel the next several questions and responses are significant to our consideration of this issue. Said questions and responses are reproduced as follows:

Q. [Trial Counsel] So, what did you go do? Wait, wait. Did he say anything else to you?

A. [appellant] He told me to get the hell out of here and bring Todd back home.

Q. Did you talk back to him?

A. No. I just left the room at that.

Q. Where did you go and what did you do?

A. I went back to my room and told Todd to, "Come on."

Q. Where did you go?

A. Outside.

Q. What did you do outside?

A. I just told him, "Let's do it." He knew what I meant.

Q. What did you do?

A. Went to the tool box and got that shoe box with the stun guns and the knives in it.

Q. And what did you do with those things?

A. Put them in our pockets and went into the house.

Q. What did you do when you got in the house.

A. Went after dad, my dad.

In *Nobles, supra,* the Court quoted extensively from their prior opinion in *Sattiewhite v. State,* 786 S.W.2d 271, 289 (Tex.Crim.App. 1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990), in an attempt to resolve the second *Royster/Rousseau* prong regarding whether or not the defendant was entitled to a voluntary manslaughter instruction. We reproduce their excerpt from *Sattiewhite* as follows:

> In the determination whether the evidence was sufficient to warrant a jury charge on voluntary manslaughter, this Court must consider all relevant facts and circumstances. It is not enough that appellant acted mad or upset, the evidence must also show that the anger was the result of an act of provocation on the part of the deceased or a third party acting in concert with the deceased. In cases where this Court has held the evidence was sufficient to warrant such a charge, a distinguishing factor tends to be that the deceased and the appellant had engaged in some sort of altercation or argument which *immediately escalated into a killing. See Humphries v. State,* 615 S.W.2d 737 (Tex. Cr.App.1981) (stabbing in the course of a heated argument); *Schoelman v. State,* 644 S.W.2d 727 (Tex.Cr.App.1983) (shooting after an argument over a ring). However, this Court has distinguished cases where the passion was not sudden. *Hobson [v. State,* 644 S.W.2d 473 (Tex.Cr.App. 1983) ], *supra.* (Charge on voluntary manslaughter not warranted where altercation

took place in the morning and the stabbing took place in the evening.) *Jenkins v. State,* 740 S.W.2d 435 (Tex.Cr.App.1983). (Killing resulted after highway chase and altercation; defendant not entitled to a charge on voluntary manslaughter because fear alone is not enough to raise sudden passion.)

*Nobles,* 843 S.W.2d at 511 (emphasis added) (citations omitted) (quoting *Sattiewhite,* 786 S.W.2d at 289).

In the instant case, contrary to appellant's contention that his own testimony sufficiently satisfied the second prong of *Royster/Rousseau,* appellant explicitly stated during direct examination that the killing was the result of "go[ing] through with the plan." The record before us reflects that during the State's case-in-chief, evidence was presented that appellant and his friend, Todd, had planned, several weeks before the killings, to run away from home. To ensure that they were successful in running away, the plan included killing appellant's parents so that they, appellant's parents, would not go after the boys and bring them back home. Appellant's testimony describing the events surrounding the killings, and his accompanying emotional state at the time, certainly does not rise to a level of "anger, rage, resentment, or terror ... sufficient to render the mind incapable of cool reflection." TEX.PENAL CODE ANN. § 19.02(a)(1) (Vernon 1994). Indeed, while appellant testified that his father's words made him "very mad," the description of his actions following the encounter in the kitchen indicates a very deliberate and calculated reaction by appellant to the encounter. While we are mindful that all of the evidence must be examined, the record reflects that the killings took place inside a private residence and that, except for the appellant, all of the people involved in the incident were killed. All of this is to say that we simply cannot locate, within the record before us, any evidence that would permit a rational jury to find that if appellant was guilty, he was guilty *only* of voluntary manslaughter.[1] Therefore, the trial court did not err in refusing appellant's request for the lesser included

---

1. *See* TEX.PENAL CODE ANN. §§ 19.02 & 19.04 (Vernon 1994).

instruction on voluntary manslaughter. Points of error one and two are overruled.

Points of error three and four read as follows:

Point of Error No. Three: The trial court erred when it failed to grant appellant's motion to suppress appellant's oral statement to Trooper Marquart.

Point of Error No. Four: The trial court erred when it failed to grant appellant's motion to suppress appellant's oral statement to Detective Durst.

The record before us reflects that separate suppression hearings were held concerning the admissibility of the verbal description of circumstances surrounding the murders related by appellant to Missouri State Trooper Marquart, the initial arresting officer, and later to Detective Durst, the officer who accompanied appellant back to Jefferson County.

It appears from the record that the morning following the murders, appellant began a trip in the family vehicle, a Chevrolet Suburban, which took him from Beaumont to Clay County, Missouri via Interstate 35. It was there on I–35 in Clay County, Missouri that appellant was stopped by Trooper Marquart for a traffic violation. As he was being stopped, appellant made some furtive gestures, appearing to reach under the passenger side seat of his vehicle. Trooper Marquart feared for his safety and had appellant exit the vehicle. Trooper Marquart then approached appellant's vehicle, looked inside and observed a handgun on the front seat next to where appellant was sitting. The Trooper testified that the fact that the handgun was partially concealed was another violation of Missouri law.

Appellant was initially identified only as "Bill" as he had no driver's license. He was asked some investigatory questions and eventually placed under arrest. Appellant was read his *Miranda* [2] warnings and then handcuffed by Trooper Marquart. The trooper had been advised by police dispatcher that the "occupants" of the vehicle that had been stopped could be armed, and that "one of the occupants, the Travis suspect or subject could possibly be a suspect in a homicide." The trooper then continued to talk to appellant and at one point during the conversation appellant related that he had killed his father, David Travis, with a knife. Trooper Marquart then questioned appellant regarding the killing and appellant recounted the circumstances surrounding the murders of his father, mother, and Todd Thompson at appellant's residence. During the course of the questioning, Trooper Marquart learned that appellant was sixteen years old. He then took appellant to the Clay County Juvenile Facility.

The following morning, authorities from Jefferson County, Texas, including Detective Durst of the Beaumont Police Department, arrived at the Juvenile Detention Facility where appellant was being held. Appellant was brought before Missouri State Circuit Court Judge James E. Welch. The authorities from Jefferson County had previously provided Judge Welch with an instrument entitled, "Statutory Warning of Juvenile by Magistrate." Judge Welch conducted a juvenile magistrazation proceeding as per TEX. FAM.CODE ANN. § 51.09(b) (Vernon 1996). Thereafter, appellant was transferred to the custody of Detective Durst for return to Jefferson County, Texas.

■ The basis for appellant's complaints under points of error three and four involve a variety of constitutional and statutory provisions. As we appreciate his main argument under both points of error, appellant contends that the trial court erred in admitting testimony from both Trooper Marquart and Detective Durst as to appellant's description of the events surrounding the murders in violation of TEX.CODE CRIM.PROC.ANN. art. 38.22, sec. 3 (Vernon 1979 & Supp.1996). Without elaborating on his art. 38.22, sec. 3 complaint, appellant then argues that conducting the four-part test announced in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and relied on in *Jones v. State*, 833 S.W.2d 118 (Tex.Crim. App.1992), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993), proves that none of appellant's statements were admissible through the officers' testimony.

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

However, the flavor of appellant's argument under his *"Brown—four-part test"* analysis is distinctly one of involuntariness of the statements in violation of the Fifth Amendment. We feel, therefore, that appellant's reliance on *Brown v. Illinois,* under the particular complaints raised on appeal, is misplaced.

The "four-part test" fashioned by the Supreme Court in *Brown v. Illinois* was for the sole purpose of determining whether a suspect's statement, given as a result of custodial interrogation following an illegal arrest was sufficiently an act of free will so as to purge the primary taint of said illegal arrest for *Fourth* Amendment purposes. *Brown v. Illinois,* 422 U.S. at 601–604, 95 S.Ct. at 2260–62, 45 L.Ed.2d at 426–427. While confusion between Fourth and Fifth Amendment protections in this area is common, the Supreme Court characterized the distinction as follows:

> Although, almost 90 years ago, the Court observed that the Fifth Amendment is in "intimate relation" with the Fourth, *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Miranda warnings thus far have not been regarded as a means either of remedying or deterring violations of Fourth Amendment rights. Frequently, as here, rights under the two Amendments may appear to coalesce since "the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment." *Ibid.;* see *Mapp v. Ohio,* 367 U.S. [643] at 646 n 5, 6 L.Ed.2d 1081, 81 S.Ct. 1684 [1686–87], 84 A.L.R.2d 933. The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.

*Brown v. Illinois,* 422 U.S. at 601, 95 S.Ct. at 2260–61, 45 L.Ed.2d at 425–426.

A careful reading of appellant's arguments and authorities under points of error three and four fails to indicate a contention that the initial stop or subsequent arrest was illegal. No Fourth Amendment issue is presented for review under these two points of error.

▆▆▆ We now turn to appellant's art. 38.22, sec. 3 argument as well as the contention that appellant was coerced into conversing with both Trooper Marquart and Detective Durst. Initially, we must again distinguish appellant's authority. In considering issues involving substantive rights of pre-transfer juveniles, such as the admissibility of statements, the Court of Criminal Appeals has held that until the moment transfer from juvenile court jurisdiction to "adult" district court jurisdiction is ordered, said issues, though raised in the criminal forum, shall be controlled by applicable provisions of the Family Code. *Griffin v. State,* 765 S.W.2d 422, 427 (Tex.Crim.App. 1989). Our analysis, therefore, is based upon TEX.FAM.CODE ANN. § 51.09 (Vernon 1996).

The record reflects that at the conclusion of the suppression hearing conducted on August 23 and 24, 1994, the trial court found said statements to have been made voluntarily and without coercion or undue influence. The trial court also found that appellant's statements contained "assertions of fact; circumstances were found to be true and which conduce to establish the guilt of the Defendant." While it is apparent that the trial court was relying on TEX.CODE CRIM.PROC. ANN. art. 38.22, sec. 3(c) (Vernon 1979 & Supp.1996),[3] § 51.09(b)(2) of the Family Code

---

**3.** Sec. 3(c) contains the following provision:
 (c) Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted

contains strikingly similar language. Section 51.09(b)(2) reads as follows:

(b) Notwithstanding any of the provisions of Subsection (a) of this section, the statement of a child is admissible in evidence in any future proceeding concerning the matter about which the statement was given if:

\* \* \* \* \* \*

(2) it be made orally and the child makes a statement of facts or circumstances that are found to be true, which conduct tends to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed.

So similar are the two provisions, art. 38.22, sec. 3(c) and § 51.09(b)(2), that the Court of Criminal Appeals in *Griffin, supra,* observed the following:

We note, however, that had the court of appeals measured admissibility of appellant's oral confession against the standard of Article 38.22, § [3(c)], V.A.C.C.P., its conclusion would likely have been the same since § 51.09(b)(2), supra, "was added in 1975, apparently to make the oral statements of juveniles admissible on the same terms as the oral statements of adults[.]" *Dixon v. State,* 639 S.W.2d 9, 11 (Tex. App.—Dallas 1982), citing, *inter alia,* Dawson, Delinquent Children and Children in Need of Supervision, 8 Tex.Tech L.Rev. 119, at 132 (1976).

*Griffin,* 765 S.W.2d at 426, n. 6.

In the instant case, testimony from the suppression hearing conducted on August 23 and 24, 1994 indicates that, following the initial discovery of the bodies, the Beaumont Police Department personnel investigating the murders had a variety of suspicions regarding the perpetrator or perpetrators, and a general idea of the circumstances of said murders, but nothing solid. This all changed, however, when appellant provided a detailed description of the events, first to Trooper Marquart, and later to Detective Durst. Indeed, the actual murder weapons were recovered as a result of appellant's conversation with Detective Durst on the trip

or stolen property or the instrument with

back to Beaumont from Missouri. Furthermore, the testimony indicates that the various conversations with appellant did not take place in coercive atmospheres or involve interrogation techniques that were of such a nature that "any confession thereby obtained was unlikely to have been the product of a rational intellect and a free will." *See Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408–2416, 57 L.Ed.2d 290, 304 (1978); *Griffin,* 765 S.W.2d at 428; *S.D.J. v. State,* 879 S.W.2d 370, 374–375 (Tex.App.—Eastland 1994, writ denied). The trial court did not err in finding appellant's oral statements admissible. Points of error three and four are overruled.

■ Point of error five states, "The trial court erred when it failed to grant appellant's motion to suppress illegally seized evidence of the 'notebook with the plan.'" The record reflects that police were called to the residence where the bodies were discovered by neighbors who became concerned when appellant's younger brothers returned home from a weekend sleep-over and could not get into their house. When police arrived, they noticed what appeared to be blood at several places outside the residence. Officers managed to enter the residence through a bedroom window. The three bodies were then discovered whereupon investigators and I.D. personnel were called to the scene. While going through the house at that time, investigators entered appellant's bedroom and opened a zipped duffel bag. The bag contained school books and a spiral notebook belonging to appellant. The spiral notebook contained, among other things, a list, later identified to be in appellant's handwriting, which appellant and Todd Thompson used in preparation for their leaving home. The list contained notations apparently indicating that the plan was to kill several people in order to effectuate their departure. Among those on the list were appellant's parents. The trial court conducted a brief hearing on appellant's written motion to suppress the notebook. Following the denial of said motion, the spiral notebook was admitted into evidence at trial.

which he states the offense was committed.

Appellant contends he had an expectation of privacy from unreasonable searches and seizures in his house, papers, and possessions which required the authorities to have secured a search warrant before entering his room and searching his zipped duffel bag. In *Mincey v. Arizona*, 437 U.S. at 385, 98 S.Ct. at 2408, 57 L.Ed.2d at 290, and reaffirmed in *Thompson v. Louisiana*, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), the Supreme Court held that there is no "murder scene" exception to the Fourth Amendment's requirement of a warrant whereby police make a warrantless search of the entire premises simply because a homicide recently occurred there. The Court, however, carved out a narrow exception to the above rule in that when police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises as the need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent an exigency or emergency. *Mincey*, 437 U.S. at 392, 98 S.Ct. at 2413, 57 L.Ed.2d at 300.

In *Brimage v. State*, 918 S.W.2d 466 (Tex. Crim.App.1996) (opinion on rehearing), the Court of Criminal Appeals discussed *Mincey's* "Emergency Doctrine" (also known as the Exigent Circumstances Doctrine). Writing for the majority, Judge Mansfield made the following observations:

The Emergency Doctrine has been construed to justify entry into a residence to try to locate an individual who has been reported as missing. *People v. Wharton*, 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290 (1991), *cert. denied* 502 U.S. 1038, 112 S.Ct. 887, 116 L.Ed.2d 790 (1992). The Oklahoma Court of Criminal Appeals held that a warrantless search of a dwelling to discover evidence that could reveal the location of an individual reported as missing is justified under the Emergency Doctrine. *Chaney v. State*, 612 P.2d 269, 277 (Okla. Crim.App.1980), *cert. denied* 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981)....

The Seventh Circuit found a warrantless search of a crack house to be lawful as it was based on a report that a teenage girl might be there under circumstances indicating she was being held there against her will. *United States v. Hughes*, 993 F.2d 1313 (7th Cir. [1993] 1991). Other courts have held warrantless searches to be permissible under the Emergency Doctrine where the police had reason to believe kidnapped children were in defendant's home and defendant had a rape record, *State v. Stevens*, 311 Or. 119, 806 P.2d 92 (1991); and where the police had reason to believe an injured woman was inside premises whose door was ajar and blood was on the floor near the entrance, *Oken v. State*, 327 Md. 628, 612 A.2d 258 (1992).

We have used an objective standard of reasonableness in determining whether a warrantless search is justified under the Emergency Doctrine. This objective standard of reasonableness used in evaluating the police's conduct takes into account the facts and circumstances known to the police at the time of the search. *Garcia v. State*, 827 S.W.2d 937 (Tex.Cr.App.1992); *Janicek*, 634 S.W.2d at 691.[4]

*Brimage*, 918 S.W.2d at 501.

The testimony from the suppression hearing indicates the investigators knew that appellant was the only member of the Travis family not accounted for. Evidence observed at the scene could not rule out the possibility that appellant was a kidnapping or murder victim and that appellant may have been seriously injured. The fact that investigators were considering appellant as a possible suspect was also admitted. Detective Durst testified that he was trying to locate "anything that could give us an idea where Bill was." It appears that at the point at which the search of appellant's room and his duffel bag took place the only information that the investigators had was that they had three vicious murders, that appellant had been at the house at the time of the murders, that someone other than the victims had attempted to dress some injuries, that the family vehicle was missing, and that appellant was nowhere to be found. The testimony also reflected that no search warrant was ever issued with

4. *Janicek v. State*, 634 S.W.2d 687 (Tex.Crim. App.1982).

regard to the residence where the bodies were discovered.

 We believe that the holding in *Brimage* controls our resolution of this issue. The Court in *Brimage* held as follows:

Given the information known to the police at the time and based on the above excerpts from the testimony of Captain Gomez at the suppression hearing, there was sufficient evidence for the trial court to find that the warrantless search of appellant's residence was objectively reasonable under the Emergency Doctrine, the intent of the search being to locate complainant or, alternatively, to find evidence hopefully leading to the discovery of complainant at a different location.

*Brimage,* 918 S.W.2d at 503. In *Brimage,* the particular circumstances leading up to the discovery of the victim's body closely match those in the instant case leading up to the discovery of the spiral notebook in question. Under the holding and rationale set out in *Brimage,* the trial court did not err in denying appellant's suppression motion.[5] Point of error five is overruled.

Point of error six complains of trial court error in denying appellant's motion to suppress two knives recovered at the murder scene. At the outset we note the fact that, unlike the notebook complained of in the previous point of error, there was apparently no suppression hearing regarding the admissibility of the knives. Appellant's brief provides a record reference to volume seven of the statement of facts which indeed contains testimony from a suppression hearing. However, said hearing concerned itself with items seized from appellant's bedroom, specifically the spiral notebook and a box atop appellant's bed. We are therefore left with examining appellant's objection at trial to the State's tender of the knives.

The record reflects the following objection to the knives by appellant's trial counsel:

[The State]: Offer State's Exhibit Ninety-seven and offer State's Exhibit Number Ninety-eight.

[Trial Counsel]: You've offered them both. I'd like to see them.

[The State]: Give them back or we'll examine them up here.

The Court: Let's examine them up here.

[Trial Counsel]: Your honor, we'd object to the admission in evidence Ninety-seven and Ninety-eight. It's not proper chain of custody and no testimony indicating how he knows these are one in (sic) the same knives.

The Court: Overruled. Ninety-seven and Ninety-eight are admitted.

 It is clear that appellant's trial objection does not comport with his objection now on appeal. An objection stating one legal basis may not be used to support a different legal theory on appeal. *Burks v. State,* 876 S.W.2d 877, 908 (Tex.Crim.App. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995). Point of error six is overruled.

 Point of error seven complains of trial court error in failing to allow appellant's expert witness to testify before the jury. The record reflects that the trial court conducted a hearing out of the jury's presence on August 31, 1994, at the State's request, to determine the admissibility of the testimony of Dr. Curt Wills under TEX.R.CRIM.EVID. 401 & 705. At the hearing, the State merely inquired of Dr. Wills the general purpose for his testimony. The appellant did not question Dr. Wills. At the conclusion of the

5. The State's brief combined the discussion of points of error five and six. The State failed to provide any authority to support its reply to these two points of error. At the suppression hearing, the State argued that the notebook was admissible based upon *Brown v. State,* 856 S.W.2d 177 (Tex.Crim.App.1993). We find reliance on *Brown* misplaced under the facts of the instant case in that *Brown* dealt with the concept of "implied consent" to a search of an appellant's premises by authorities when the appellant himself calls the police to the scene to investigate a homicide. Notwithstanding the complete absence of authority from the State in support of its position on appeal, the law requires that a suppression ruling be sustained if it can be upheld on any valid theory regardless whether the State argued it at trial or on appeal. *Lewis v. State,* 664 S.W.2d 345, 347 (Tex.Crim.App.1984); *Roth v. State,* 917 S.W.2d 292 (Tex.App.—Austin 1995, no pet. h.).

hearing the trial court refused to permit Dr. Wills to testify before the jury. At that point, appellant made no request for an offer of proof or a bill of exception, but merely reiterated the reasons for Dr. Wills' testimony, and why said testimony was admissible.

■ Finding similar assertions and comments by defense counsel insufficient to preserve error for appellate review under TEX. R.CRIM.EVID. 103 and TEX.R.APP.P. 52, the Court of Criminal Appeals in *Love v. State*, 861 S.W.2d 899, 901 (Tex.Crim.App.1993), addressed this issue as follows:

> An informal bill will suffice as an offer of proof when it includes a concise statement of counsel's belief of what the testimony would show. *Moosavi v. State*, 711 S.W.2d 53 (Tex.Crim.App.1986). When counsel intends to rely upon an informal bill to preserve error, the bill must include a summary of the proposed testimony. In this case, however, counsel merely informed the trial judge that he intended to establish a basis for an instruction on the lack of probable cause and, hence, failed to provide the trial judge with a concise statement regarding the content of the testimony he proposed to elicit from the witness.

In the instant case, we have no "concise statement regarding the content of the testimony" appellant proposed to elicit from Dr. Wills. Error was not preserved. Point of error seven is overruled.

Appellant's eighth point of error avers that reversible error occurred when the trial court denied appellant's motion for a change of venue. Appellant filed his written motion in compliance with TEX.CODE CRIM.PROC.ANN. art. 31.03 (Vernon 1989). The State responded by timely filing three controverting affidavits as per TEX.CODE CRIM.PROC.ANN. art. 31.04 (Vernon 1989). The trial court held a hearing on the issue and reached the following conclusion:

> The Court: Based on this evidence the defendant's motion is denied. I will make that order without prejudice to reconsider it should—I want to review all the news media information, which I have not done. And, also, I have a duty independent of any motion to change venue if it appears, from whatever source, that a fair jury can

not be selected. So, based on this evidence the motion is denied but without prejudice for me to reconsider it at other times.

Trial counsel for appellant reurged the change of venue motion following the conclusion of the voir dire examination. Again, the trial court denied the motion.

■ In point of error eight, appellant first contends that because the State failed to call any witnesses at the change of venue hearing this should be considered analogous to the State not filing controverting affidavits which, in turn, would result in no contested issue of fact being presented thereby requiring the trial court to rule in appellant's favor as a matter of law. *McManus v. State*, 591 S.W.2d 505, 516 (Tex.Crim.App.1979), *overruled on other grounds* by *Reed v. State*, 744 S.W.2d 112 (Tex.Crim.App.1988). We are unwilling to carve out new law to the extent argued by appellant.

■ The purpose of a controverting affidavit is to provide a form of pleading which establishes that there is a factual dispute in need of resolution. *Burks*, 876 S.W.2d at 890. The issue was resolved to our satisfaction in *Beets v. State*, 767 S.W.2d 711, 743 (Tex.Crim.App.1987), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579 (1989) with the following language taken from *Lundstrom v. State*, 742 S.W.2d 279, 286 (Tex.Crim.App.1986):

> What [we] glean from all of these old cases is that the burden is on a defendant to file his motion for change of venue with supporting affidavits, and that the State must then either default by filing nothing, see *Durrough v. State*, 562 S.W.2d 488 (Tex.Crim.App.1978), or *join issue by filing controverting affidavits to show that such prejudice does not exist.* It may successfully controvert by means of a general denial of the "credibility" or "means of knowledge" of the defendant's compurgators, or it may, as in the instant case, generally deny that there exists "so great a prejudice against" the defendant or a "dangerous combination against" the defendant so that "he cannot expect a fair

trial." See generally, Art. 31.03, V.A.C.C.P.

In the instant case, the State was not required to present witnesses in order to place the change of venue issue in controversy. The trial court properly proceeded to hear and decide the issue on the merits.

 Appellant's second complaint in point of error eight is that the evidence elicited at the hearing and during voir dire proved that an impartial jury could not be empaneled. The scope of appellate review on this issue is well settled and was recently reiterated by the Court of Criminal Appeals in *Willingham v. State*, 897 S.W.2d 351 (Tex. Crim.App.1995), as follows:

A change of venue is proper and consistent with principles of due process when a defendant demonstrates his inability to obtain an impartial jury or a fair trial at the place of venue. A change of venue is the remedy to jury prejudice resulting from extensive, widespread inflammatory news coverage.

The mere fact that a crime was publicized in the news media does not establish prejudice or require a change of venue per se. Rather, the test is "whether outside influences affecting the community's climate of opinion as to a defendant are inherently suspect." In order to prevail in a motion to change venue, a defendant must prove that publicity about the case is pervasive, prejudicial and inflammatory. A defendant must demonstrate an "actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come."

When a trial court is presented with a motion to change venue, the trial judge must act as fact-finder with regard to the issue presented. Tex.Code Crim.Proc. Ann. Art. 31.04. The trial judge is in a better position than this Court to resolve such issues as a result of his ability to observe the demeanor of witnesses and scrutinize their veracity. Consequently, we will affirm the trial court's judgment absent evidence of an abuse of discretion. *Id.* at 357 (citations omitted).

 In the instant case, we cannot say that the trial court abused its discretion in denying appellant's motion for change of venue. While appellant certainly proved that publicity concerning the case was pervasive, he did not satisfactorily demonstrate that said publicity was prejudicial and inflammatory. On the contrary, several venirepersons commented on how fair the reporting of the events had been within the local media. Appellant also failed to prove that, within the *community* from which the jury was selected, any real and identifiable prejudice existed which was attributable to the publicity. While all fifty of the members of the venire had heard something of the case from television, newspaper, radio, or friends or relatives, only three venirepersons expressly stated that they could not put their initial impressions aside and render a verdict based solely on the evidence presented at trial. As has been noted in many opinions, jurors do not have to be totally ignorant of the facts and issues of a particular case in order to qualify as fair and impartial factfinders. *Murphy v. Florida*, 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589, 594–595 (1975); *DeBlanc v. State*, 799 S.W.2d 701, 704 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991). Point of error eight is overruled.

 Point of error nine complains of trial court error in failing to grant appellant's various challenges for cause following the voir dire examination. Under this point of error, appellant offers absolutely no constitutional, statutory, or case authority in support of his argument. As this point is inadequately briefed, we will not review its substance. *Garcia v. State*, 887 S.W.2d 862, 873 (Tex. Crim.App.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1368, 131 L.Ed.2d 223 (1995); TEX. R.APP.P. 74(f). Point of error nine is overruled.

 Appellant's final point of error contends the trial court erred in failing to grant additional defense peremptory requests. Although the wording of the point of error is

different, the crux of appellant's argument under point of error ten is essentially identical to that of point of error nine. In point of error ten, however, appellant does reference us, albeit cryptically, to two cases of somewhat questionable authoritative value for the legal propositions upon which he relies. In the interest of justice we will address the merits of this final issue.

Appellant points out that at the conclusion of the voir dire examination, appellant requested the trial court remove twelve venirepersons [6] for cause for the reason that each juror "has a bias or prejudice in favor of or against the defendant[.]" TEX.CODE CRIM. PROC.ANN. art. 35.16(a)(9) (Vernon 1989). The trial court granted appellant's request as to three venirepersons, but denied his request as to the remaining nine. Appellant then used his peremptory strikes to remove six of the objectional venirepersons. Appellant subsequently requested six additional peremptory strikes with said request being denied by the trial court. Appellant read into the record the six additional objectional venirepersons he was forced to accept. Of those six, three ended up sitting on the jury panel.

■■■■ There is no error in failing to provide a defendant with additional peremptory strikes so long as there was no error in overruling a defendant's challenges for cause. See Burks, 876 S.W.2d at 892–893. We recognize that the appropriate analysis to be used by a trial court in ruling on the qualifications of potential jurors is whether their views would prevent or substantially impair their duties as jurors to act in accordance with the trial judge's instructions and the oaths taken by the jury. Kemp v. State, 846 S.W.2d 289, 295 (Tex.Crim.App.1992); De-Blanc v. State, 799 S.W.2d at 716.

■■■■ With regard to appellate review of this issue, great deference must be given to the trial judge who was in the best position to witness the responses of the venirepersons and to evaluate their demeanor.

Kemp, 846 S.W.2d at 295. We will reverse a trial court's ruling on the denial of a challenge for cause only when the record demonstrates a clear abuse of discretion. Ransom v. State, 789 S.W.2d 572, 582 (Tex.Crim.App. 1989), cert. denied, 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990). A defendant will not prevail by merely showing that the trial court erred in refusing his challenge for cause; he must also demonstrate actual harm stemming from the improper denial of his challenge. Kemp, 846 S.W.2d at 296. A defendant demonstrates actual harm when he shows he was forced to leave an unwanted venireperson on the jury that he could otherwise have eliminated if he had not been forced to exercise a peremptory strike to remove a venireperson properly challenged for cause. Id. The focus of our attention in the instant case would therefore appear to be on whether or not any of the nine venirepersons remaining following appellant's unsuccessful challenge for cause were properly challengeable under art. 35.16(a)(9).

Although this was a capital murder prosecution, the death penalty was not an available punishment option so no individual voir dire examinations took place. Because of this, the record of the voir dire examination is not very clear as to which particular venireperson was responding to questioning. The court reporter merely designated responses coming from "venireperson," without any name or numerical designation. Appellant's trial counsel made a rather spotty attempt at identifying who was supplying answers to his questions resulting in a record greatly lacking in clarity.

As noted earlier, all of the venirepersons had heard of the case through the media, family, and/or friends. Several of the venirepersons in question admitted to having an opinion of appellant's guilt based upon what they had heard about the case. However, a careful reading of all of the identifiable responses indicated that none of the nine venirepersons in question stated that their initial

---

6. The venirepersons in question were identified as follows: Number 6 (Kirk Abbott), Number 13 (Norman Shannon), Number 15 (John Knippa), Number 17 (Walter Bush), Number 25 (Calvin Holman), Number 30 (R. Eakin), Number 32 (Charles Smith), Number 33 (Jeffery Vincent), Number 34 (Louis Hebert), Number 43 (Edward Coburn), Number 44 (Carter Davis), and Number 49 (Shirley Alexander).

opinions could not be set aside so that they would be unable to consider the evidence and the law provided to them in reaching a verdict. This is most supported in the record at the conclusion of the voir dire examination following appellant's identification of the challenged venirepersons. The trial court permitted the State to address the challenged twelve, and the State responded with the following:

[The State]: Okay. To make sure that I have everyone I will be speaking to you, Mr. Abbott, and Mr. Shannon, Mr. Knippa, Mr. Bush, Mr. Holman, Mr. Eakin, Mr. Smith, Mr. Vincent, Mr. Hebert, Mr. Coburn, and Mr. Davis. And Ms. Alexander. Okay. And I would have some—you've been challenged for a couple of reason (sic). So, I'll have to address you separate (sic).

As I told you yesterday, what the State of Texas needs in any criminal case are jurors that can use their common sense, listen to the evidence and follow the law. What I need to find out from each of you that I named specifically what has been brought up is a challenge under 35.16(9) (sic). This is a little Code of Criminal Procedure term there that says as [Trial Counsel] stated, that you have a bias or privilege (sic) against the Defendant.

What everyone has talked about these last several hours are thoughts, feelings, impressions, opinions and things like that. What the law says is that William David Travis, regardless of what the Beaumont Enterprise or any of the news station (sic) or any of the people at the blood bank or anybody outside this courtroom thinks, feels, what their impression is, you know, what their just genuine belief may be, he is entitled to the presumption of innocence.

And to be a juror on this case, you have to say I agree with that as a part of the law of the United States and the State of Texas. Because certainly everyone that comes into these courtrooms accused of a crime is entitled to that presumption and it is just that, a presumption.

Now, the people that I named specifically, are there any of you that cannot right now regardless of what you have heard, regardless of what you have talked about or regardless of what has gone on in this courtroom; are there any of you that cannot presume William David Travis innocent? I assume then, I'll ask the question the other way; can all of you that I named and I want to see your hands, presume that William David Travis is not guilty of this crime before you go into that jury box? And I want to see the hands of those I called. Did—You can, in fact, presume him not guilty, I'm sorry. Is there anyone that can't? Anyone that just can't do that?

The record reflects that venirepersons fifteen, seventeen, and twenty-five verbally expressed their beliefs that they could not be a fair and impartial juror with the knowledge of the case they already possessed. All of the other venirepersons apparently were able to disregard any previously held opinions and provide appellant a fair and impartial hearing. At the conclusion of his address to the jury, the State's attorney joined in appellant's motion only as to venirepersons fifteen, seventeen, and twenty-five. Recognizing the great deference we must give to the trial court when it rules on challenges for cause, we simply cannot say, based upon the state of the record before us, that the trial court clearly abused its discretion in overruling appellant's challenges for cause. Therefore, the trial court did not err in denying appellant any additional peremptory strikes. Point of error ten is overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.