Jonathan Lee **KENDRICK, Appellant,**

v.

The **STATE of Texas, Appellee.**

Nos. 09–95–076 CR, 09–94–326 CR.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 3, 1996.

Decided March 12, 1997.

James R. Makin, Beaumont, for appellant.

Tom Maness, Criminal District Attorney, David W. Barlow, Assistant Criminal District Attorney, Beaumont, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

We are combining our discussion and resolution of the issues before us in one opinion because, with the exception of one point of error, the issues raised and the law used to resolve said issues are identical. Appellant was tried separately for the felony offenses of Capital Murder. In cause number 66112, appellant was indicted for causing the death of Harlan Taylor while in the course of committing or attempting to commit the offense of robbery. In cause number 66114, the same allegations were made except the victim was alleged to be Ursala Taylor. The trial in cause number 66112 began on May 16, 1994 and concluded on May 19, 1994. The trial in cause number 66114 began on September 19, 1994 and concluded on September 21, 1994. The jury in each case found appellant guilty. As appellant was

fifteen years' of age at the time the offenses were committed, the guilty verdicts resulted in the trial court automatically assessing punishment at confinement in the Texas Department of Criminal Justice—Institutional Division for life in both cases. *See* TEX.PENAL CODE ANN. § 8.07(d) (Vernon 1994). The trial court ordered that the sentences run consecutively. In cause number 66112, appellant raises three points of error. In his separately prosecuted appeal in cause number 66114, appellant raises four points of error. In both appeals, the first three points of error are virtually identical and read as follows:

Point of Error One: The trial court erred by failing to make specific factual findings regarding the voluntariness of appellant's confession.

Point of Error Two: The trial court erred in denying appellant's pretrial motion to suppress his statement which was shown to have been involuntarily given and coerced.

Point of Error Three: The trial court erred in failing to sustain appellant's timely objection to the admission of inflammatory and prejudicial photographs.

In cause number 66114, appellant raises a fourth point of error which states, "The trial court erred in stacking the appellant's sentence with a sentence arising out of the same facts." We will proceed with discussion and resolution of the first three points of error, and then conclude with the resolution of point of error four.

■ With regard to appellant's initial points of error in each case, appellant contends that the trial court failed to comply with TEX.CODE CRIM.PROC.ANN. art. 38.22, § 6 (Vernon 1979). The record before us reflects that the oral statement in question was made after appellant was taken into custody by Investigator Carl Rose of the Jefferson County District Attorney's Office and Ranger L.C. Wilson. Appellant was fifteen years' old and no transfer to felony district court had yet taken place. As we noted in our recent case of *Travis v. State*, 921 S.W.2d 559, 568 (Tex.App.—Beaumont 1996, no pet.), in considering issues involving substantive rights of pre-transfer juveniles, such as the

admissibility of statements, the Court of Criminal Appeals has held that until the moment transfer from juvenile court jurisdiction is ordered, said issues, though raised in the criminal forum, shall be controlled by applicable provisions of the Family Code. *See also Griffin v. State*, 765 S.W.2d 422, 427 (Tex.Crim.App.1989). Therefore, any question as to what is or is not required of the trial court with regard to appellant's pretransfer oral statement is controlled by TEX. FAM.CODE ANN. § 51.09 (Vernon 1986 & Vernon Supp.1994).

An examination of § 51.09 reveals no requirement that the trial court, after ruling that the juvenile's statement was voluntarily made, enter an order containing findings of fact and conclusions of law in support of said ruling. Although the record before us includes a supplemental transcript containing findings of fact and conclusions of law by the trial court, as is required under art. 38.22, sec. 6, we hold that § 51.09 is controlling with regard to the admissibility of a pretransfer juvenile's statement, and that § 51.09 does not require the trial court to issue written findings of fact and conclusions of law following a hearing on the voluntariness of said statement. Point of error one is overruled in each appeal.

The oral statement at issue in points of error two is the same one involved in the previous points of error. Said oral statement was introduced into evidence at both trials over appellant's objection. By agreement of the parties, the voluntariness issue was not relitigated in the second trial, with the trial court at the second trial taking judicial notice of the testimony in the first trial. The trial court in the second trial adopted its findings of fact and conclusions of law made following the hearing conducted in the first trial. In his second points of error, appellant contends his oral statement was obtained in violation of "the Fifth and Fourteenth Amendments to the United States Constitution, Article I, sections 10 and 19 of the Texas Constitution and articles 38.21 and 38.22 of the Texas Code of Criminal Procedure." While appellant does attempt to separate the federal and state constitutional provisions in his briefs, he does not argue or provide authority to establish

that his protection under the Texas Constitution *exceeds,* or *differs* from, that provided to him by the United States Constitution. *See Arnold v. State,* 873 S.W.2d 27, 33 (Tex.Crim. App.1993), *cert. denied,* 513 U.S. 830, 115 S.Ct. 103, 130 L.Ed.2d 51 (1994). We will therefore not address appellant's state constitutional argument. *Id.; Heitman v. State,* 815 S.W.2d 681, 690 n. 23 (Tex.Crim.App. 1991). Recall that we stated in points of error one that the proper statutory provision regarding admissibility of appellant's statement is § 51.09 of the Family Code.

■■■ A statement is "involuntary," for purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker. *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex.Crim.App.1995). In holding the right against self-incrimination applies to juveniles to the same extent it applies to adults, the Supreme Court has added an extra caution when incriminating statements made by a juvenile are offered into evidence. *In re Gault,* 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967). The Court held that if counsel is not present when the juvenile makes a statement, "[T]he greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Id.* This admonishment seems to place a more stringent burden on the State to prove, by a preponderance of the evidence, the juvenile's statement was given voluntarily. *See Alvarado,* 912 S.W.2d at 211; *see also Colorado v. Connelly,* 479 U.S. 157, 168–169, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473, 485 (1986). However, the trial court is still the sole judge of the admissibility of the statement, and the trial court's finding will not be disturbed on appeal absent a clear abuse of discretion. *Alvarado,* 912 S.W.2d at 211.

■■■ In the instant case, the record of the suppression hearing indicates that Jefferson County Justice of the Peace Harold Engstrom fully admonished appellant with the entire panoply of warnings contained in § 51.09(b)(1) of the Family Code. Judge Engstrom also testified that he felt that appellant had the ability to fully understand and comprehend said warnings. Indeed, the final portion of the written warning form filled out and signed by Judge Engstrom provided the following:

I hereby certify that I have examined Jonathan Kendrick outside of the presence and independently of any law enforcement officer or any prosecuting attorney and have determined that this person understands the nature and content of these warnings.

Investigator Carl Rose was the State's next witness. Rose described the events surrounding the detention of appellant on December 10, 1993. The particular circumstances were described by Investigator Rose as follows:

Q. [The State] Once he was picked up, where was he taken?

A. [Rose] He was picked up at his residence on Tram Road. He was transported by the Beaumont Police Department.

Q. Did he go to Judge Engstrom?

A. He went in front of Judge Engstrom, yes, sir.

Q. And to your knowledge, did Judge Engstrom advise him of his rights?

A. That's correct, sir.

Q. After Judge Engstrom talked to him, did you have an occasion to talk to him?

A. Yes, sir, I did.

Q. Who else was with you, if anyone, when you talked to him?

A. Ranger L.C. Wilson.

Q. And was that—did that occur over in the juvenile facility of the Beaumont Police Department?

A. Yes, sir, it did.

Q. Was there anyone else present in the room?

A. No, sir, there was not.

Q. When you—what did you say to Jonathan Kendrick when he first came in?

A. I identified myself who I was and I identified Ranger Wilson and we spoke briefly, and I told him why he was here.

Q. What was that?

A. He was being detained for questioning on a capital murder case.

Q. Did he appear to understand that?

A. Yes, sir.

Q. What happened next?

A. We talked to him very briefly. He initially, of course, said he had nothing to do with this case. We talked to him approximately about five minutes. We ran down the evidence that we had that would substantiate our contention that he was involved. And it didn't take approximately I'd say about five minutes before he kind of bowed his head and said, "I did it."

Q. At any time during that first five minutes, did he tell you that he wanted to talk to a lawyer?

A. No, sir.

Q. Did he tell you that he wanted to talk to anyone other than you-all?

A. No, sir.

Q. Did it appear that he had been abused in any manner?

A. No, sir.

Q. Did he proceed to tell you, you and Ranger Wilson, what had occurred?

A. Yes, sir, he did.

Appellant was called by his trial counsel to testify at the hearing. Although he admitted that Judge Engstrom did admonish him as to his rights under § 51.09, appellant stated that he did not remember Judge Engstrom mentioning that a lawyer could be appointed for appellant if he was unable to hire one, nor did he (appellant) really understand what was going on. Appellant further testified on direct examination that when he was initially taken from his home, he was not permitted to put on his shoes and was bare-footed until sometime after arriving at the police station. Appellant also stated that at some point he was scared and that he didn't read anything that he signed that day. During direct examination, appellant explained his oral statement to Investigator Rose and Ranger Wilson as follows:

Q. [Trial Counsel] And what happened then?

A. [appellant] And they took a statement from me.

Q. Now, you say they took a statement. Did you supply facts to them, or did they tell you what happened?

A. The Texas Ranger come in and said, "This is the way you did it" and he just told me a bunch of stuff, and I said, "Yeah, that's the way I did it."

Q. Now, why would you say you did that?

A. So my brother wouldn't hurt my family.

Q. And your brother being . . .

A. Roy, III.

Q. Had he threatened you?

A. Yes, sir.

Q. So, you were admitting to a murder that you hadn't done.

A. Yes, sir.

Q. Did you tell the officers this?

A. No, sir.

Appellant's alleged reason for providing the oral statement was touched on during the State's cross-examination which we reproduce as follows:

Q. [State (lead counsel)] Okay. And the bottom line, I think, of what [Trial Counsel] was asking you, are you telling Judge Giblin that you gave the statement to the police on December 10th—that that's the statement you wanted to give them because of what Roy had told you?

A. [appellant] Yes, sir.

Q. But I mean, the police didn't make you give that statement, did they? That's what you wanted to do.

A. (Nodding affirmatively)

[State (lead counsel)]: I'll pass the witness.

[State (co-counsel)]: Your Honor, I want the record to reflect that that was an affirmative nod as a result of that last question.

THE COURT: That will reflect if . . .

*CONTINUED CROSS–EXAMINATION*

*By The State:*

Q. [State (lead counsel)] Is that what you wanted to do?

A. [appellant] Yeah.

In an apparent attempt to clarify matters, appellant's trial counsel revisited the issue during re-direct examination as follows:

Q. [Trial Counsel] Now, this statement you gave them, you say that's what you wanted to tell them. That's not what you wanted to tell them, is it?

A. I wanted to protect my family.

Q. Did you feel that you could just remain silent?

A. No.

Q. Did you feel threatened by the officers?

A. Well, in a way because if I would have told them that my brother would have done it, then they would have went and questioned him and then they wouldn't have arrested him right away and he could still hurt my family.

It is clear from appellant's testimony alone that he voluntarily admitted to having committed the offense in question allegedly to prevent his older brother from doing harm to his (appellant's) family. No official, coercive conduct is apparent from any of the testimony. Appellant was not deprived of his rights under the Fifth Amendment when his oral incriminating statement was admitted before the jury.

■ With regard to any denial of appellant's statutory rights, § 51.09 of the Family Code contains the following provision under subsection (b)(2):

(b) Notwithstanding any of the provisions of Subsection (a) of this section, the statement of a child is admissible in evidence in any future proceeding concerning the matter about which the statement was given if:

   \*    \*    \*    \*    \*    \*

(2) it be made orally and the child makes a statement of facts or circumstances that are found to be true, which conduct tends to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed.

The record of the suppression hearing reflects that Investigator Rose testified as follows regarding appellant's oral statement admitting to the offense:

Q. [The State] And did he tell you how he entered the Taylor residence?

A. [Rose] Yes, sir, he stated he entered through the front door.

Q. And what did he tell you occurred after he went into the Taylor residence?

A. He stated that he was walking down the hallway when he was surprised by Mr. Taylor and he had a knife with him in his possession. He said Mr. Taylor came from behind him. He turned around and stabbed Mr. Taylor. He was unsure how many times he did so. And while the attention was with Mr. Taylor, Mrs. Taylor came out of the bathroom and started screaming. He chased her through the master bedroom where she attempted to use the telephone, and they wrestled for the telephone for a little while. He stabbed her also. She ran into another bedroom and tried to get out the window. He wrestled with her. She supposedly scratched his neck. There was also a piece of jewelry he had on at that time, a necklace, and—

Q. (Interrupting) Let me stop you right there. Did he advise you at that time when you were talking to him on December 10th that a necklace that had been found at the scene, which is State's Exhibit No. 47 was, in fact, his necklace?

A. That's correct.

Q. And prior to that time, were you or any law enforcement officers aware that that necklace belonged to Jonathan Kendrick?

A. We were aware that there was a necklace located in the house, but we did not know exactly who it belonged to.

Investigator Rose also testified that appellant's oral statement provided the specific location of the murder weapon and some of the jewelry stolen from the Taylor's home. Rose stated that subsequent searches located both the murder weapon and the jewelry based upon appellant's statement. As such, appellant's oral inculpatory statement was admissible under § 51.09(b)(2), which appears *not* to predicate admissibility on the

juvenile ever having been provided any warnings whatsoever. Because appellant's statement was voluntary under the Fifth Amendment and because said statement also satisfied the express provisions of § 51.09(b)(2) of the Family Code, we cannot say that the trial court's denial of appellant's motion to suppress was a clear abuse of discretion. Point of error two is overruled in each appeal.

Appellant's third points of error complain of the inflammatory nature of several photographs, State's Exhibits 49 through 54 (66112), and State's Exhibits 49 through 51 (66114) in that they graphically depict the charred, nude body of the victims, Harlan Taylor and Ursala Taylor. We have received, for our examination, the original exhibits from the court reporter. As we observed in *Phipps v. State*, 904 S.W.2d 955, 957 (Tex.App.—Beaumont 1995, no pet.), a court may consider many factors in determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, such as the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked. *See also Long v. State*, 823 S.W.2d 259, 272 (Tex.Crim.App.1991), *cert. denied*, 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Ultimately, the admissibility of photographs over any challenge is within the sound discretion of the trial judge. *Jones v. State*, 843 S.W.2d 487, 501 (Tex.Crim.App. 1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993).

In his opinion in *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex.Crim.App.1995), Judge Meyers provides the following well-reasoned response to similar complaints of inflammatory photographic exhibits admitted by the State:

> The photographs are gruesome. That is to say, they are disagreeable to look at, but they depict nothing more than the reality of the brutal crime committed. The photographs are powerful visual evidence, probative of various aspects of the State's theory of the offense including the brutality and heinousness of the offense. Appel-

lant must realize that it is precisely the quality which we describe as "powerful" which gives rise to his arguments that the photographs are prejudicially inflammatory. But when the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence. A trial court does not err merely because it admits into evidence photographs which are gruesome. [citations omitted] The trial court did not abuse its discretion in admitting the video recording or photographs of which appellant complains.

We echo the above-stated rationale in *Sonnier* with regard to the photographs at issue. The color photographs depicting the charred remains of the victims are somewhat gruesome, but these results were apparently what appellant himself intended. We too find no abuse of discretion by the trial court in admitting the photographs. The probative value of the photographs has not been shown to be substantially outweighed by any unfair prejudice to appellant. TEX.R. OF CRIM.EVID. 403. Point of error three is overruled in both appeals.

Appellant's fourth point of error contained in his appeal in cause number 66114 contends that because the murders of the victims arose out of the same criminal episode, the trial court erred in ordering the sentences to run consecutively. Generally, a trial court's authority to cumulate sentences is found in TEX.CODE CRIM.PROC.ANN. art. 42.08 (Vernon Supp.1997). The Court of Criminal Appeals in *LaPorte v. State*, 840 S.W.2d 412, 415 (Tex.Crim.App.1992), held that a trial court's general authority under art. 42.08 is further limited by TEX.PENAL CODE ANN. § 3.03 (Vernon 1994), "whenever a single criminal action arising out of the same criminal episode occurs, . . ." The Court in *LaPorte* held that a defendant is prosecuted in "a single criminal action" "whenever allegations and evidence of more than one offense arising out of the same criminal episode, as that term is defined in Chapter 3, are presented in a *single trial or plea proceeding,* whether pursuant to one charging instrument or several, and the

provisions of Section 3.03 then apply." [emphasis supplied] *Id.*

While the State in the instant case concedes that the murders took place during the "same criminal episode," as that term is defined in TEX.PENAL CODE ANN. § 3.01 (Vernon 1994), it is obvious that two separate trials took place, with separate juries, approximately four months apart. Appellant seems to ignore the additional requirement under § 3.03 that he be prosecuted in "a single criminal action" in order to be statutorily protected from exposure to consecutive sentencing by the trial court under art. 42.08. As appellant in the instant case was prosecuted in separate criminal actions, the trial court did not err in "stacking" the respective life sentences. Point of error four in cause number 66114 is overruled. The judgments and the sentences in cause numbers 66112 and 66114 are affirmed.

AFFIRMED.