TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-97-00511-CV






In the Matter of P. J. W.








FROM THE COUNTY COURT AT LAW NO. 1 OF BELL COUNTY


NO. 163,509-C, HONORABLE EDWARD S. JOHNSON, JUDGE PRESIDING 







 A jury found appellant P.J.W., a juvenile, delinquent for committing aggravated
robbery. See Tex. Penal Code Ann. § 29.03(a)(2) (West 1994). The jury found that P.J.W. used
a deadly weapon and returned a disposition of twenty-five years' confinement with initial
commitment to the Texas Youth Commission, to be transferred under determinate sentencing
procedures at the appropriate time to the Institutional Division of the Texas Department of
Corrections. P.J.W. challenges the order of delinquency by two points of error, arguing that the
trial court erred by (1) admitting his two statements because they were given involuntarily, and
after he invoked his right to counsel and, (2) failing to grant a mistrial after the State commented
during its closing argument about P.J.W.'s failure to testify. We will affirm the juvenile court's
adjudication and disposition order. 





Background


 On March 3, 1997, P.J.W. gave two statements to juvenile authorities at the Youth
Services Unit in Killeen. His first statement was exculpatory while his second statement was a
confession. 

 In his first statement, P.J.W. stated that he was walking home alone from a friend's
house about 8:00 p.m. on Wednesday, February 26. As he walked behind the Stop N Save
convenience store, he saw a man running from the store directly toward him. When the man was
about six to eight feet away, P.J.W. started running away from the store back to his friend's
house. As he was running, P.J.W. heard two shots and soon realized that he had been shot in the
leg. When he got back to his friend's house, his friend took him to the hospital. P.J.W. did not
know the man who was running from the Stop N Save but described him as about his same height
wearing a black mask and green BDU pants. 

 In his confession, P.J.W. stated that on Wednesday, February 26, he took a .45-caliber gun to the basketball court where he met some other youths. They all were drinking
alcohol and doing drugs. The next thing he remembered was being in the Stop N Save holding
a gun to the store clerk's head and demanding money. He reached over and grabbed all of the
money out of the cash register. He left the store and as he was running away he slipped and fell
with the gun in his hands. The gun went off and P.J.W. soon realized that he shot himself in the
leg. He believed the gun was still by the railroad tracks where he fell. P.J.W. stated that he was
wearing BDU pants and that the bag and the mask came from his bedroom. He did not have the
money and thought he dropped it as he was leaving the store.

 P.J.W. contended the two statements were given involuntarily and were in violation
of his Fifth Amendment rights. The juvenile court held a hearing outside the jury's presence to
determine the voluntariness of P.J.W.'s statements. See Jackson v. Denno, 378 U.S. 368 (1964).
P.J.W., two juvenile officers, and the Bell County justice of the peace who admonished P.J.W.
before his confession testified at the hearing. At the hearing, P.J.W. indicated that no promises
were made to induce him to sign the exculpatory and that it was given voluntarily. At the
conclusion of the hearing, the court overruled any objections to the confession and determined it
was admissible. 

 During his case-in-chief, P.J.W. offered his exculpatory statement into evidence.
When the State offered the confession into evidence, P.J.W. again objected that his confession was
given involuntarily. His objection was overruled and his confession was admitted into evidence.


Discussion


Voluntariness of Statements

 By his first point of error, P.J.W. contends the trial court erred by admitting into
evidence both statements he gave on March 3. P.J.W. raises several arguments regarding this
point of error. Because P.J.W. offered his exculpatory statement into evidence, he has failed to
preserve any error regarding that statement. See Tex. R. App. P. 33.(a)(1). 

 P.J.W. first argues that his statements were involuntary because he invoked his
right to counsel before giving each statement. P.J.W. also argues that his confession should not
have been admitted because it was involuntarily given after a three-hour detention by police
officers who did not transfer him to juvenile authorities. When the State offered the confession
at trial, P.J.W. objected that it was given involuntarily because the officers used coercive means
and that he was unlawfully detained either by the officers or parental influences acting at the
behest of the officers.

 Before its revision in September 1997, Texas Family Code section 51.09(d)(2), (3)
provided that a statement made by a child was admissible if the statement did not stem from a
custodial interrogation or, without regard to whether the statement stemmed from a custodial
interrogation, the statement was voluntary and had a bearing on the credibility of the child as a
witness. (1) 

 The trial court is the sole judge of the admissibility of a juvenile's statement and
the trial court's finding will not be disturbed on appeal absent an abuse of discretion. Kendrick
v. State, 942 S.W.2d 120, 123 (Tex. App.--Beaumont 1997, no pet.) (citing Alvarado v. State,
912 S.W.2d 199, 211 (Tex. Crim. App. 1995)). While the right against self-incrimination applies
to juveniles to the same extent it applies to adults, the Supreme Court added an extra caution when
incriminating statements made by a juvenile are offered into evidence. Kendrick, 942 S.W.2d
at 123 (citing In re Gault, 387 U.S. 1, 55 (1967)). "The greatest care must be taken to assure that
the admission was voluntary, in the sense not only that it was not coerced or suggested, but also
that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." In
re Gault, 387 U.S. at 55. In judging whether a juvenile confession is voluntary, the trial court
must look to the totality of the circumstances. In re R.M., 880 S.W.2d 297, 299 (Tex. App.--Fort
Worth 1994, no writ). If the circumstances indicate that the juvenile defendant was threatened,
coerced, promised something in exchange for his confession, or incapable of understanding his
rights and warnings, the trial court must conclude the confession is involuntary. Id. (citing
Darden v. State, 629 S.W.2d 46, 51 (Tex. Crim. App. 1982)). 

 At the voluntariness hearing juvenile Officer Faes explained that on March 3 she
called P.J.W.'s father and at about 3:00 p.m., P.J.W. and his father arrived at the Youth Services
Unit, a certified juvenile processing center. They were there until about 6:20 p.m. Officer Faes
spoke with P.J.W. and took his exculpatory statement between 3:00 and 3:30 in the afternoon.
Afterward she told P.J.W. he was free to leave. She then spoke with P.J.W.'s father and with
P.J.W. a second time. The reason she spoke with P.J.W. a second time was because she wanted
him to clarify portions of his statement. She told him she was concerned because portions of his
exculpatory statement were inconsistent. She explained to the juvenile court that she did not make
any promises to P.J.W. or suggest that things would get easier if he "came clean at this time." 
She denied that she ever told P.J.W. that she would put in a good word with the courts or with
the juvenile probation officers if he cooperated. She explained that at all times P.J.W. was free
to leave the Youth Services Unit.

 At the hearing, Officer Enochs testified he was sent to Darnall Hospital on February
26, 1997, for a victim investigation after receiving a report that a juvenile, P.J.W., had suffered
a gunshot wound. According to Enochs, P.J.W. spoke with him briefly and asked if he was an
investigator. P.J.W. also asked him, "Did they tell you what happened to me?" to which Enochs
replied, "yes." P.J.W. began to tell his version of events during which Enochs suggested that he
speak with his father before talking to Enochs further. Enochs did not take a statement from
P.J.W. that day. Enochs next spoke with P.J.W. on March 3 at the Youth Services Unit. 
However, he did not take either of the statements at issue. Additionally, he testified he did not
place P.J.W. in custody, did not threaten him or coerce him and did not tell him that he was not
free to leave. Enochs also spoke with P.J.W.'s father but did not make any promises or say
anything that might be construed as an offer of leniency. He recalled telling P.J.W.'s father,
"truth [is] always the best policy or something similar, and that judges are human also and they
understand people make mistakes and if people come forward with the truth it's nearly always the
best," and would he try to talk to P.J.W. P.J.W.'s father then spoke privately with P.J.W. for
about ten to fifteen minutes. Enochs then spoke with P.J.W. who told him that he wanted to tell
the truth. Enochs asked him if his father had told him that Enochs could make no promises, to
which P.J.W. replied, "yes." About 4:30 p.m., Enochs asked Faes to notify Judge Potvin that
they needed him to give warnings to P.J.W. The officers wanted to have the judge give P.J.W.
the statutory warnings as a precautionary measure even though he was not in custody. 

 P.J.W. testified at the hearing that he requested an attorney at the hospital and also
when he was giving his exculpatory statement to Officer Faes. After giving his exculpatory
statement, P.J.W. talked with Officer Enochs. P.J.W. recalled Officer Enochs telling him that
if he committed the offense he should go ahead and confess because Officer Enochs "was going
to try his best to get [P.J.W.] locked up." P.J.W. also explained that Officer Enochs told him that
he would talk to the judge and try to make his sentence lighter. P.J.W. argues that based upon
Enochs' promise, he changed his statement and confessed involvement in the aggravated robbery. 
After confessing, P.J.W. went home with his father. The next day P.J.W. was taken into custody
by juvenile officials.

 Judge Potvin testified that he gave P.J.W. the statutory warnings orally and in
writing pursuant to former Texas Family Code, section 51.09(b) before P.J.W. confessed. (2) 
P.J.W. initialed each warning. P.J.W. then gave his statement to Officer Faes. Judge Potvin
reviewed P.J.W.'s confession with him without any officers present and certified the confession
as given voluntarily. P.J.W. signed his confession in Judge Potvin's presence.

 The trier of fact, in this instance the juvenile court, is the sole judge of the
credibility of witnesses and weight to be given their testimony. Gibbs v. State, 819 S.W.2d 821,
830 (Tex. Crim. App. 1991). It is not the job of the appellate court to engage in our own factual
review, but we must determine whether the trial court's ruling is supported by the record. Romero
v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). The reviewing court must review the
entire record to determine whether there are any facts that lend support for any theory upon which
the trial court's ruling can be sustained. Id. 

 Based upon the testimony presented at the hearing, we conclude that the facts
support the trial court's decision that P.J.W.'s statements were given voluntarily. Although
P.J.W. testified that he requested an attorney while at the hospital and before giving his second
statement, Officers Enochs and Faes testified to the contrary. Both officers testified that P.J.W.
never asked to speak to an attorney. Although P.J.W. testified that Officer Enochs told him to
confess because he was going to try his best to have him locked up, Enochs denied making the
statement. Additionally, although Officer Enochs asked P.J.W.'s father to speak with his son
about telling the truth, this does not necessarily indicate that coercive tactics were used to gain
P.J.W.'s confession. Both officers testified that P.J.W. was free to leave the juvenile unit at any
time during the three hours. Judge Potvin gave P.J.W. the required statutory warnings, properly
reviewed his confession with him, and P.J.W. signed his confession in Judge Potvin's presence.
After reviewing the totality of the circumstances, we conclude that the trial court could have
concluded that the officers did not use coercive tactics to gain the confession.

 P.J.W. finally argues that at the time Judge Potvin certified the voluntariness of his
confession, he was unaware that P.J.W. had given a previous statement. Citing In re R.C.S., 546
S.W.2d 939, 946 (Tex. Civ. App.--San Antonio 1977, no writ), P.J.W. argues that, since Judge
Potvin was unaware of his previous exculpatory statement, Judge Potvin was somehow misled in
certifying P.J.W.'s confession as voluntarily given.

 In R.C.S., the juvenile gave a confession and was placed in the juvenile detention
center. Two days later, juvenile officers determined the confession was an involuntary statement
because of their failure to follow the requirements of Family Code, section 51.09(b). R.C.S. was
taken from the detention center back to the police station. On the way, the officers informed
R.C.S. that his first statement could not be used against him and asked whether he would like to
make a second statement. This time the magistrate gave the proper warnings and R.C.S. gave a
second confession. The magistrate, however, was unaware of R.C.S.'s previous involuntary
confession. The R.C.S. court held that 


once a confession is given, the ability of the accused to resist the information-seeking process is substantially reduced. The impact of a warning given after the
first incriminating statement has been made is much weaker than it would have
been absent a prior confession, for one cannot be reasonably expected to persist in
the denial of that which he has already admitted.



Id. at 947 (emphasis added). The R.C.S. court could not accept the State's argument that a
fourteen-year-old boy, who was continuously incarcerated since giving an illegal confession, was
adequately warned of the fact that his first confession in no way affected his right to refuse to
submit to further interrogation some forty hours later. The court found that this was particularly
difficult to accept when the magistrate giving the warnings before the second confession was
unaware of the previous confession. Id. at 948. The court reversed the adjudication of
delinquency and remanded the cause for a new trial.

 The facts in R.C.S. are distinguishable from those in the case before us. Unlike the
first statement in R.C.S., P.J.W.'s first statement was exculpatory. The R.C.S. court addressed
a different situation, one where a juvenile first confessed to an offense. We conclude that R.C.S.
is not dispositive of this case. While Judge Potvin was unaware of P.J.W.'s exculpatory
statement, we conclude that had no impact on the voluntariness of P.J.W.'s subsequent confession.
Judge Potvin properly followed the statutory requirements for warning a juvenile before taking
a statement. Error, if any, was harmless since P.J.W. decided to make a different statement and
confess after being given the proper warnings. 

 Having addressed all of P.J.W.'s arguments, we overrule point of error one.


Jury Argument

 By point of error two, P.J.W. argues that the trial court committed reversible error
during closing argument by failing to declare a mistrial after the State made certain comments
about P.J.W.'s failure to testify.

 In closing arguments to the jury P.J.W.'s attorney made the following statements:


[P.J.W.'s Attorney]: What happened to his clothes? . . . Did he dump the gun? .
. . I don't know. . . .



In rebuttal the State presented the following:



[State's Attorney]: Mask, mask. Dad says mask, police say mask. This robber
with the gun says mask. He says it in his statement. You'll read it. He has it. 
Mask. This is [P.J.W.].


Gloves, [P.J.W.]. Pants, [P.J.W.]. Jacket, [P.J.W.] -- Even loans the jacket to
[C.N.] so they can go rob the store so he can put a hood over his head. Jacket. 
We're talking [P.J.W.] all over this place.


Where is the gun? Ask [P.J.W.]. He's the one who chose where the gun went.
Where is the money? Ask [P.J.W.], he's the one that chose where the gun went.



(Emphasis added.) P.J.W.'s attorney immediately objected that the State's remarks were improper
comments on P.J.W's decision not to testify. The court sustained the objection, instructed the jury
to disregard the two statements as regarding any implication of asking P.J.W. where the
incriminating items were, and to disregard the comments and not to consider them for any
purpose. P.J.W.'s attorney moved for a mistrial, which the court denied.

 P.J.W. argues that the State's highly improper comments were a direct reference
to his failure to testify. P.J.W. contends that the comments were so prejudicial that their effect
on the jury could not be cured by an instruction to disregard. 

 It is fundamental that the failure of an accused to testify may not be the subject of
comment by the prosecution, for such a comment is in violation of the privilege against self-incrimination in Article I, section 10 of the Texas Constitution and the Fifth Amendment to the
United States Constitution made applicable to the States by the Fourteenth Amendment. See
Griffin v. California, 380 U.S. 609 (1965); Allen v. State, 693 S.W.2d 380, 381 (Tex. Crim. App.
1984). The test to be applied to determine whether there has been a violation by a prosecuting
attorney is whether the language used was "manifestly intended or was of such character that the
jury would naturally and necessarily take it to be a comment on the accused's failure to testify."
Patrick v. State, 906 S.W.2d 481, 490-91 (Tex. Crim. App. 1995) (citing Banks v. State, 643
S.W.2d 129, 134-35 (Tex. Crim. App. 1982)). In applying this test, the facts and circumstances
of each case must be analyzed to determine whether the language used was of such character. 
Dickinson v. State, 685 S.W.2d 320, 323 (Tex. Crim. App. 1984). A mere indirect or implied
allusion to the accused's failure to testify does not violate appellant's rights. Patrick, 906 S.W.2d
at 490-91.

 The State urges that the error was cured by the court's instruction to disregard. We
note, however, the prohibition against a comment on the accused's failure to testify is mandatory
and the adverse effect of any reference to such failure is not generally cured by an instruction to
disregard. Montoya v. State, 744 S.W.2d 15, 37 (Tex. Crim. App. 1987). Additionally, this type
of improper argument is less likely to be found harmless than other argument errors. Cook v.
State, 702 S.W.2d 597, 601 n.2 (Tex. Crim. App. 1985). 

 We find the State's comments were a direct allusion to P.J.W.'s failure to testify.
While the first part of the State's argument was responsive to P.J.W.'s comments during his
closing argument, the last two comments crossed the line into the forbidden area of commenting
on a defendant's right not to testify. The State may not respond to a defense argument by
commenting on a defendant's failure to testify. The State's comments were reckless, improper
and erroneous.

 Having determined that the comments were improper, we address the issue of harm
to determine whether the error complained of probably caused the rendition of an improper
judgment. See Chapman v. California, 386 U.S. 18 (1967); Orona v. State, 791 S.W.2d 125,
129-30 (Tex. Crim. App. 1990); Tex. R. App. P. 44.1(a)(1). Harm is determined from the facts
of an individual case, and resolved according to "the probable effect [the argument] has on the
minds of jurors." Cook, 702 S.W.2d at 601 (quoting Mayberry v. State, 532 S.W.2d 80, 85 (Tex.
Crim. App. 1975)).

 In this case, P.J.W.'s attorney objected immediately to the State's comments. The
court quickly sustained the objection and immediately gave a clear instruction to the jury that they
were to disregard the State's comments for all purposes. We therefore review the evidence
presented and the context of the offending argument to determine whether the error requires us
to reverse.

 The State's case included testimony from the Stop N Save clerk, Mi Thomas, who
was on duty the evening of February 26. She noticed three boys, one African-American and two
Caucasians, when they came into the store because, considering the weather, they were wearing
heavy clothing. Thomas identified P.J.W. as the African-American boy. He was wearing gloves,
a black mask covering his face and was carrying a gun. The other boys were wearing hooded
jackets and no gloves. After waiting for a customer to leave the store, the three boys approached
the counter where Thomas was standing behind the cash register. P.J.W. then showed Thomas
the gun and emptied a bullet to show her that it was a real, loaded gun. He then asked her to
remove the cash from the register. Thomas crouched down on the floor and P.J.W. reached over
the counter and took the cash out of the register. The three boys ran out of the store. 

 Two bystanders testified they saw the three boys go into the store. One testified
she saw one of the boys hold the gun up to the store clerk. However, neither of these witnesses
provided any evidence that implicated P.J.W.

 C.N., one of the Caucasian boys involved in the robbery, testified against P.J.W.
He did so after the trial court rejected any plea agreement. C.N. explained that the three boys
were drinking and smoking drugs when the robbery scheme was hatched. C.N. testified that he
had a gun and that P.J.W. had a .45-caliber pistol. C.N. testified to essentially the same set of
facts as Thomas. C.N. and the third boy involved split $50 and he did not know what happened
to the rest of the money.

 P.J.W.'s father also testified for the State. He had checked at home and noticed
that P.J.W.'s dark blue ski mask was missing from P.J.W.'s room. 

 Judge Potvin testified about his certification of P.J.W.'s confession as being
voluntary. In the confession, P.J.W. admitted using the .45-caliber gun and holding it to the store
clerk's head. P.J.W. did not know what happened to the money but thought the gun was by the
railroad tracks where he slipped and shot himself in the leg. The mask came from his room but
he did not know where the mask was after the robbery; he might have thrown it in the dumpster.

 First, we conclude that the comments were harmless after considering them in the
context of the case. The comments occurred while the State was focusing on the inability of the
police to recover certain items of hard evidence including a ski mask, money, and a gun. 
Although P.J.W. did not testify from the witness stand at trial, in his confession that was admitted
into evidence he stated that, at the time of the robbery, he had these items in his possession.
Consequently, there was evidence before the jury from P.J.W. via his confession about these
items. Since there was some evidence before the jury by P.J.W., the comments are less egregious
than in the cases cited by P.J.W. in which the testimony of the defendant was crucial on guilt or
innocence and the defendants' confessions, if any, were not before the jury as evidence. See
Brown v. State, 814 S.W.2d 477, 479-80 (Tex. App.--Dallas 1991, pet. ref'd) (defendant was
only witness capable of revealing to jury what he sounded like when speaking); Lopez v. State,
793 S.W.2d 738, 743-44 (Tex. App.--Austin 1990, pet. dism'd) (testimony of defendant crucial
when only two persons present were deceased and defendant); Cook, 702 S.W.2d at 600 (only
material issue in sexual assault was consent between complainant and defendant). 

 The second reason we conclude the State's comments were harmless even in the
absence of these items of hard evidence is the overwhelming evidence of guilt presented to the
jury. The State's evidence other than P.J.W.'s confession included testimony from the
complainant who identified P.J.W. as the robber, an accomplice, and P.J.W.'s father. We hold
that, in light of the overwhelming evidence of guilt coming from evidence in addition to P.J.W.'s
confession, the improper comments were rendered harmless. See Garrett v. State, 632 S.W.2d
350, 354 (Tex. Crim. App. 1982) (harmless because evidence of defendant's guilt was
"overwhelming, if not beyond all doubt"); Mayberry v. State, 532 S.W.2d 80 (Tex. Crim. App.
1975).

 Point of error two is overruled.


Conclusion


 Having overruled P.J.W.'s points of error, we affirm the juvenile court's order.



 

 Mack Kidd, Justice 

Before Justices Powers, Kidd and B. A. Smith

Affirmed

Filed: October 1, 1998

Do Not Publish
1.   See 72d Leg., R.S., ch. 593, § 1, 1991 Tex. Gen. Laws 2129, 2130 (amended, revised and
renumbered by 75th Leg., R.S., ch. 1086, § 4, 1997 Tex. Gen. Laws 4181; currently Tex. Fam.
Code Ann. § 51.095(b) (West Supp. 1998)). 
2.   See 64th Leg., R.S., ch. 693, § 9, 1975 Tex. Gen. Laws 2154 (amended, revised and
renumbered by 75th Leg, R.S., ch. 1086, § 4, 1997 Tex. Gen. Laws 4181; currently Tex. Fam.
Code Ann. § 51.095(a)). 



Thomas was standing behind the cash register. P.J.W. then showed Thomas
the gun and emptied a bullet to show her that it was a real, loaded gun. He then asked her to
remove the cash from the register. Thomas crouched down on the floor and P.J.W. reached over
the counter and took the cash out of the register. The three boys ran out of the store. 

 Two bystanders testified they saw the three boys go into the store. One testified
she saw one of the boys hold the gun up to the store clerk. However, neither of these witnesses
provided any evidence that implicated P.J.W.

 C.N., one of the Caucasian boys involved in the robbery, testified against P.J.W.
He did so after the trial court rejected any plea agreement. C.N. explained that the three boys
were drinking and smoking drugs when the robbery scheme was hatched. C.N. testified that he
had a gun and that P.J.W. had a .45-caliber pistol. C.N. testified to essentially the same set of
facts as Thomas. C.N. and the third boy involved split $50 and he did not know what happened
to the rest of the money.

 P.J.W.'s father also testified for the State. He had checked at home and noticed
that P.J.W.'s dark blue ski mask was missing from P.J.W.'s room. 

 Judge Potvin testified about his certification of P.J.W.'s confession as being
voluntary. In the confession, P.J.W. admitted using the .45-caliber gun and holding